UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 1:11-CR-93 |
| v. | ) | Chief Judge Curtis L. Collier |
| | ) | |
| WALTER CARDIN | ) | |

## MEMORANDUM & ORDER

On September 27, 2011, the government charged Defendant Walter Cardin ("Defendant" or "Cardin") with nine counts of fraud under 18 U.S.C. § 1031, one count of conspiracy to commit wire fraud under 18 U.S.C. § 1343, and one count of conspiracy to engage in monetary transactions in criminally derived funds under 18 U.S.C. § 1956. Now before the Court is the government's motion for a judicial inquiry to determine whether a conflict exists between Defendant and his attorney (Court File No. 19). Defendant filed no response. On June 27, 2012, the Court conducted a hearing on the government's motion. As explained below, the Court concludes a potential conflict exists between Defendant and his counsel, but accepts Defendant's waiver of that potential conflict. Thus, to the extent the government's motion seeks to disqualify Defendant's counsel from this case, the Court **DENIES** the motion (Court File No. 19).

## I.      BACKGROUND

### A.      Factual Background

The Tennessee Valley Authority ("TVA") owns and operates nuclear power plants, including the Browns Ferry Nuclear Plant in Athens, Alabama. TVA entered a contract with

Stone and Webster Construction Inc. ("Stone and Webster"), who was owned by Shaw Group Inc. ("Shaw"), and who was to provide maintenance, modification, and construction. Stone and Webster was to record the injury rates and total number of injuries at these facilities, and would receive a safety bonus if the injury rates were below a certain level. In 2002, there were a number of work-related injuries at Browns Ferry, and Stone and Webster replaced Safety Managers, and hired Defendant Cardin as the Medical Case Manager.

In 2003, Stone and Webster stopped using TVA's on-site medical office, and contracted with an outside medical provider to create its own on-site medical office. There, Cardin used different standards and procedures for classifying and recording injuries. Cardin has been indicted for fraud for falsely reporting injuries, and therefore wrongfully inflating the safety bonus received by Stone and Webster. In 2008, Stone and Webster settled a claim relating to the issues involved in this case with TVA, by paying a substantial sum, but not admitting wrongdoing.

In February 2009, Cardin signed a Separation Agreement and Release ("Agreement") with Shaw. In this agreement, Shaw (the "Company") promised to indemnify Cardin for certain legal fees. Promise 1(c) states,

> The Company will indemnify you for reasonable legal expenses incurred in connection with the ongoing investigation by the TVA Office of Inspector General concerning matters that occurred during your employment with the Company until such time, if any, that your interests become in conflict with the interests of the Company. Upon a determination by the Company that your interests are in conflict with the Company, the Company will give you thirty (30) days notice of its intention to cease further indemnification. At the conclusion of such 30-day period any additional legal fees will be at your own expense.

(Court File No. 19, ex. 1, pp. 3-4). Also relevant is Promise Number 7(a), which states:

> "Confidential Information" means all information known by you as a result of your employment with the Company, including but not limited to, (1) the Company's legal, administrative, safety and financial matters, and (2) the internal

administrative and financial operations of the Company and any of the business related to the Company. You agree that all "confidential Information" that you know was received in strictest confidence, and you promise that you will not disclose any portion or any part of the "Confidential Information" to anyone for any reason.

(Court File No. 19, ex. 1, p. 6). Attorney Bruce Gardner ("Gardner") became involved in the investigation in 2006, and has since been retained by Cardin.[1] In May 2012, the government moved for a judicial inquiry to determine whether a conflict of interest exists such that Gardner should be disqualified (Court File No. 19). Stated concisely, the prosecution argues given the limitation that Shaw will only pay for Gardner to represent Cardin if Shaw's interests do not conflict with Cardin's, Gardner will not represent Cardin as zealously and capably as he otherwise might.

## B. Evidentiary Hearing

On June 27, 2012, the Court held a hearing to determine whether there was a conflict of interest on account of the fact Shaw will only pay Cardin's legal fees if his and its interests do not conflict.

The government explained it read Promise 7 as precluding Cardin from sharing any information about Shaw with anyone. Therefore, in the government's view, should Cardin cooperate with the government, testify about certain facts before the grand jury, or share information at sentencing, he would violate the Agreement, and Shaw could terminate funding for Gardner's services. Cardin's counsel recognized the apparent conflict, but maintained the Agreement had never in practical terms limited his counsel or interfered with the course of action he deemed best. He further explained through his communication with the counsel of Shaw and

---

[1] Gardner has clearly been involved in the investigation since 2006, and Cardin appears to have retained him at that time, yet the Agreement was not signed until 2009. The exact details of the representation before 2009 are not clear to the Court, but do not affect the ruling on this motion.

3

his own reading of the contract, he understood Promise 7 to only restrict Cardin's sharing of "trade secrets." Cardin likewise stated his understanding of "confidential information" was only information that would be considered trade secrets.

The Court followed the same line of inquiry it did in *United States v. Almany*, 621 F.Supp.2d 561 (E.D. Tenn. 2008), asking Cardin about his understanding of his right to conflict-free representation, the possibility for conflicts in the pre-trial, trial, sentencing, and post-sentence phases, and his interest in waiving that conflict.

**(1) PreTrial.** The Court questioned Cardin about his understanding of the effect the Agreement would have during the pretrial stage, since Gardner may not be able to counsel him where his actions might conflict with the interests of Shaw. The Court questioned Cardin as to his knowledge of the possibility and benefits of cooperating with the government as part of a possible plea agreement.

**(2) Trial.** The Court also questioned Cardin about conflicts that may manifest in the trial stage. It addressed the possibility Cardin would want to tell the jury that someone else was in charge, or some other defense that might implicate Stone and Webster or Shaw, with the possible consequence Gardner could not recommend such a course of action.

**(3) Sentencing.** The Court further questioned Cardin about problems that may manifest at the sentencing stage. This included the potential of Cardin divulging information implicating Shaw that may lead to a reduction in sentence. Because such disclosure of information could be a violation of the Agreement, which may in turn jeopardize Shaw's continued payment of Gardner's legal fees, Gardner may either seek to dissuade Cardin from making such a disclosure or otherwise take a position more beneficial to Shaw than to Cardin himself.

**(4) Post-Sentence.** Finally, the Court addressed problems arising from a conflict in the

post-conviction context. For example, Cardin may be able to reduce his sentence by providing information to the government, *see* Fed. R. Crim. P. 35(b)(1) ("Upon the government's motion made within one year of sentencing, the court may reduce a sentence if the defendant, after sentencing, provided substantial assistance in investigating or prosecuting another person."), but not receive assistance from Gardner to the extent any information would again jeopardize the Agreement.

In each of these four areas, Cardin affirmed he understood the potential area of conflict, and was nonetheless willing and eager to proceed in this matter with Gardner as his attorney.

Cardin was then asked whether he had any questions for the Court, and he answered he did not. Based on this colloquy with Cardin, the Court determined there was a serious potential for a conflict of interest, and then asked Cardin whether he wished to waive this conflict. Cardin stated he understood his constitutional right to conflict-free representation, and the potential for conflict. He declared that he wished to waive not only the discussed conflict, but also all others, giving up his right to a lawyer who does not have any conflicts. Cardin explained his position by indicating he had developed a trusting relationship with Gardner, and had relied on his counsel for a number of years. Cardin further noted he had authorized Gardner to investigate Shaw and Stone and Webster to determine whether he (Cardin) had available defenses that might implicate these entities. Thus, in Cardin's view, nothing in Gardner's conduct or in the Agreement suggested the need for a new counsel now or at any point in the future.

## II. DISCUSSION

### A. Governing Law

Although there is a presumption that favors permitting a defendant to select his own

counsel, that presumption "may be overcome not only by a demonstration of actual conflict but by *a showing of a serious potential for conflict.*"  *Wheat v. United States*, 486 U.S. 153, 164 (1988) (emphasis added).  District courts have substantial latitude in determining whether there is a potential conflict of interest, and whether to accept a waiver of that conflict. *Id.*; *United States v. Swafford*, 512 F.3d 833 (6th Cir. 2008); *United States v. Mays*, 69 F.3d 116, 121 (6th Cir. 1995) (The "standard of review of a district court's decision regarding disqualification of counsel is a generous one. The district court is to be given wide latitude.").  Where only a potential conflict exists, the Court must determine the likelihood the potential conflict will arise during the trial. *Id* at 159.  If a court determines that there is either an actual or a potential conflict, it must then decide whether to allow the defendant to waive that conflict.  Either choice implicates the Sixth Amendment, creating a "whipsaw" effect:

> If a trial court disqualifies counsel, [the] defendant will argue . . . a violation of his Sixth Amendment right to counsel of his choice. If a trial court refuses to disqualify an attorney, a defendant may later attempt to raise an ineffective assistance of counsel claim based on conflict of interest, asserting that his waiver was not knowingly or voluntarily made.

*United States v. Wilson*, No. 10-20581, 2011 WL 740200, at *2 (E.D. Mich. Feb. 24, 2011) (quoting *Serra v. Michigan Dep't of Corrections,* 4 F.3d 1348, 1353–54 (6th Cir.1993).

In deciding whether to accept a defendant's waiver of a conflict of interest, a court has an "obligation to balance the defendant's right to counsel of choice with the court's independent obligation to serve justice." *Swafford*, 512 F.3d at 840.  Fulfilling this obligation requires two distinct inquiries: a court must determine whether the waiver is sufficient, and whether the conflict is of a type which can be waived. *See United States v. Osborne*, 402 F.3d 626, 631 (6th Cir. 2005); *Wheat*, 486 U.S. at 160.  The first inquiry examines the specific defendant before the court; that defendant must be aware of the dangers and ramifications of the waiver. *Osborne*, 402

F.3d at 631 ("[T]he court must be convinced that the defendants understand the rights being waived and the consequences of the waiver of those rights."). Thus, as with a guilty plea, a defendant can only waive an actual or potential conflict of interest if he does so knowingly and voluntarily. *Wilson*, 2011 WL 740200, at *2.

The second inquiry focuses on the role of the courts in ensuring a legal process the defendant and the public recognize as fair. It follows that "trial courts . . . have an independent duty to ensure that criminal defendants receive a trial that is fair and does not contravene the Sixth Amendment." *Wheat*, 486 U.S at 160. Courts have an "institutional interest in the rendition of just verdicts," and cannot accept waivers jeopardizing this interest. *Id* at 160. A court's "institutional interest in the rendition of just verdicts" encompasses not only safeguarding a defendant's Sixth Amendment right; it also includes attention to the effect a waiver might have on the public, because "the right of counsel does not override the broader societal interests in the effective administration of justice . . . or in the maintenance of 'public confidence in the integrity of our legal system.'" *Id*. at 158 n. 2 (quoting *In re Paradyne Corp.,* 803 F.2d 604, 611, n. 16 (11th Circ. 1986)) (quotations omitted). Thus, before accepting a waiver, a court must determine whether the waiver complies with a defendant's Constitutional rights, and whether the public will or will not perceive such a waiver as unfair or otherwise compromising the administration of justice.

### B.    Analysis

In making its determination, the Court balanced Defendant's qualified right to be represented by counsel of his choosing with his right to a defense conducted by an attorney free of conflict and society's strong interest in the credibility and respect of the judiciary, and its interest in assuring fair legal proceedings, conducted in the ethical standards required in the legal

profession. *Wheat*, 486 U.S. at 160. The Court considered the nature of the conflict; the likelihood problems would arise from the conflict during counsel's representation; and the seriousness of the consequences of the conflict. *See Swafford*, 512 F.3d at 839.

### 1. Conflict of Interest

Based on the evidence presented to this Court, there is a high probability a conflict of interest will arise at trial. As raised in the hearing, there is a serious potential for conflict at every stage of the trial. In a possible pretrial plea context and at sentencing, Gardner cannot counsel Cardin to cooperate with the government at the expense of Shaw; likewise it is possible the confidentiality provision precludes Cardin from revealing certain information (even information that does not directly implicate Shaw). At trial, Cardin may want to offer defenses inculpating Shaw in an effort to exculpate him. In light of the Agreement, Gardner arguably could neither support such defenses nor vigorously cross examine representatives of Shaw. Thus, the court concludes that there is a substantial potential for a conflict of interest.

### 2. Waiver

Having determined a substantial potential for conflict exists in this case, the Court must next decide whether to accept Cardin's waiver of that conflict. The Court concludes Cardin's waiver satisfies both prongs of the two-part inquiry under *Osborne*. First, Cardin knowingly and voluntarily waived his conflict of interest. Throughout the evidentiary hearing, Cardin expressed understanding of the conflict, the potential for harm, and the results of his actions. He is competent and intelligent; he testified he completed his high school education, and he has held jobs that required a fair degree of intellect and responsibility. Despite recovering from a stroke and taking prescription drugs, his answers were thoughtful and coherent. After thorough questioning and discussion it is the opinion of the Court he fully comprehends the rights he is

waiving and accepts the ramifications of such a waiver. *See Osborne*, 402 F.3d at 631 ("[T]he court must be convinced that the defendants understand the rights being waived and the consequences of the waiver of those rights.").

The Court must next determine whether its institutional interest in just verdicts prohibits the acceptance of this waiver, *Wheat*, 486 U.S at 160, with a particular focus on the "public confidence in the integrity of our legal system" *id*. at 158 n. 2 (quoting *In re Paradyne Corp.*, 803 F.2d 604, 611, n. 16 (11th Circ. 1986)) (quotations omitted). Measuring and weighing the public confidence on the legal system is imprecise, but a court should avoid circumstances which would give the public pause as to whether the entire trial process is conducted in accordance with the standards of fairness and accuracy expected, and whether a defendant is receiving full, effective legal counsel. The Court must thus decide if these concerns override the presumption in favor of a defendant's choice of counsel, and outweigh the harm of disqualifying Cardin's counsel, thereby compelling him to either pay his own legal fees or accept a federal public defender or an attorney assigned to him under the Criminal Justice Act ("CJA"). 18 U.S.C. § 3006A.[2]

What might give the public pause is the Agreement's conditional indemnification. A similar such conditional indemnification was condemned in *United States v. Fazzio*, Crim. Action No. 11-157, 2011 WL 6140746 (E.D. La. Dec. 9, 2011). Fazzio was indicted for fraud in 2011 in connection with the construction management company Garner Services LLC. This incident was called the "Garner Services matter." Fazzio was also the CFO of River Birch, a

---

[2] While federal defenders and CJA panel attorneys are of course well-qualified, and at times more experienced in federal court than privately retained attorneys, the white-collar specialization needed for this case may lend itself to a private attorney, and it appears Gardner has already invested a large amount of time and energy in working on this case. While not necessarily the case, it is very possible that the replacement of Gardner by a federal defender or a CJA panel attorney would be a detriment to Cardin.

landfill company that was the venue of a federal search warrant in 2010. No indictment was issued, but the incident was named "The River Birch matter." Fazzio was represented in the Garner Services matter by the attorneys London, Cobb, and Haedicke. He was represented in the River Birch matter solely by London. River Birch paid for London to represent Fazzio in the River Birch matter but had not yet paid for anyone to represent Fazzio in the Garner Service matter. River Birch was authorized to pay the legal fees of employees who had acted in good faith, and in a manner that was in the best interests of River Birch. *Id*. at 1. The district court refused Fazzio's waiver of conflict partially on these grounds, stating,

> the fee arrangement produces a conflict because it is conditional. Specifically, the River Birch Board of Directors will not indemnify Defendant if it finds that Defendant failed to act . . . in, and not opposed to, the best interests of [River Birch]. . . . Therefore, the arrangement may stop Defendant from cooperating with the Government or his counsel from advising him to do so, because this action will make him ineligible for indemnification under the terms.

*Id*. at *3. The Court must then decide whether a conditional indemnification contract automatically creates an unwaivable conflict; whether it alone damages the public perception of the justice system enough to deny a waiver. The Court concludes the conditional indemnification in this case does not require denial of Cardin's waiver for three reasons.

First, it is not uncommon for employers to indemnify employees for legal fees. Here, unlike a case where a drug lord or mafia kingpin pays for an underling to take the blame, there is no evidence Shaw (or Stone and Webster) was operating some kind of criminal enterprise. *Cf. id.* at *2 ("Courts and commentators have recognized the inherent dangers that arise when a criminal defendant is represented by a lawyer hired and paid by a third party, particularly when the third party is the operator of the alleged criminal enterprise.") (quoting *Wood v. Georgia*, 450

U.S. 261, 268-69 (1981).[3]  Moreover, Cardin's situation differs significantly from that of Fazzio's.  The court in *Fazzio* took no exception to River Birch's payment of Fazzio's legal fees with respect to the River Birch matter.  The concern only arose with respect to payment of any of his legal fees incurred in a separate investigation, the Garner Services matter.  In Cardin's case, there is only one investigation—that of Shaw.  Thus, the *Fazzio* court's decision is of limited applicability to the case currently before the Court.

Second, that Gardner has been involved in the case since 2006 is relevant to ensuring a fair trial, and the public's perception such a trial is indeed fair. Although a court should not prize convenience over fairness, maintaining current counsel is likely both easier and more fair to Cardin than compelling him at this juncture to obtain new representation. Because Gardner has been working on this case for so long it is unlikely another attorney would be able to do as good a job representing Cardin.  Cardin knows, trusts, and is used to Gardner, and the familiarity and expertise gained over six years cannot be completely imparted to a new attorney.  The length and breadth of this relationship suggests justice is best served by Gardner continuing in the case. Weighed in the balance with the presumption in favor of a defendant retaining his own counsel, *see Wheat*, 486 U.S. at 164, is the public's confidence in the integrity of the judicial system, *id.* at 158 n.2.  That confidence should rightfully increase where, as here, a defendant who wishes to retain consistent representation throughout a lengthy and complex criminal prosecution is permitted to do so.

Third, because Cardin and Shaw concluded the Agreement after TVA had begun investigating that Agreement's purpose is important.  Part of the consideration for the Agreement

---

[3] The fact that Stone and Webster already paid funds to TVA also weakens the theory Cardin is a scapegoat.  If Cardin were being set up to take the fall, it seems unlikely that Stone and Webster would be willing to pay TVA– they would blame Cardin until his case were resolved.

11

was that Shaw would pay for Cardin's legal fees.[4]  If this sort of conditional indemnification scheme were ruled to create a conflict, all such contracts would lose significant force, and they may harm the public.  Employers are unlikely to offer unconditional litigation fees, and if they cannot protect themselves with such limiting clauses, may simply not cover employees' legal expenses at all.  It strengthens the integrity of the justice system to enforce what one party (and most of the public) would expect from this sort of contract.

Because Cardin's waiver of conflict-free representation was knowing and voluntary and because the Court concludes such a waiver is permissible in this case, the Court accepts Cardin's waiver.  Thus, the Court will not disqualify Gardner from representing Cardin in this matter.


III.    **CONCLUSION**

For the reasons discussed above, the Court finds a potential for conflict exists between Cardin and his counsel, but accepts Cardin's waiver of any potential conflict.  Accordingly, to the extent the government's motion seeks to disqualify Cardin's counsel from this case, the Court **DENIES** the motion (Court File No. 19).

**SO ORDERED.**

**ENTER.**

/s/_____
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**

---

[4]  Cardin's understanding of this agreement is also relevant, and even if Shaw alleged that Gardner's actions violated the Agreement, they would have to prove why its interpretation of the contract was controlling. Both Gardner and Cardin stated at the hearing they understood the Agreement's reference to "confidential information" to refer to "trade secrets." Thus, before establishing Cardin violated the Agreement, Shaw would have to prove that his (and Gardner's) understanding was incorrect.